UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

PAUL WHITE,                                          **MEMORANDUM & ORDER**

                                                     **07-CV-4286 (NGG) (MDG)**

                     Plaintiff,

     -against-

SEARS, ROEBUCK & CO.,

                    Defendant.
-------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

       Plaintiff Paul White ("Plaintiff" or "White") filed this action alleging that this his former

employer, Sears, Roebuck & Co. ("Defendant" or "Sears") discriminated against him in violation

of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., the New York State

Human Rights Law, N.Y. Exec. L. § 290, et seq., and the New York City Human Rights Law,

N.Y. Admin. Code § 8-107(1)(a). (Docket Entry #1.) Defendant has filed a Motion for

Summary Judgment. (Docket Entry #17.) For the reasons below, Defendant's Motion is granted

with respect to the ADA claims; Plaintiff's pendent claims under state and municipal law are

dismissed without prejudice.

## I.    FACTUAL BACKGROUND

       The following facts are undisputed unless otherwise indicated.

### A.    Plaintiff's Employment

       On or around April 10, 1989, Plaintiff began working at a Sears store in Brooklyn, New

York as a Facilities Maintenance Technician ("FMT"). (Def. 56.1 Statement ¶ 1 (Docket Entry

#17).) In that position, Plaintiff was responsible for general maintenance and repairs at the store.

(Id. ¶ 3.) Plaintiff was diagnosed with a seizure disorder in 1993. (Id. ¶ 18.)

In March 2006, Sears eliminated all FMT positions in its New York Metropolitan district and created a new position called Quality Maintenance Technician – 1 ("QMT-1").  (Id. ¶ 4.) The QMT-1 position involves preventive maintenance, basic maintenance, and housekeeping tasks to maintain the interior and exterior of Sears stores in the New York Metropolitan district. (Id. ¶ 5.)  The position description for the QMT-1 job includes "ability to perform local travel including a valid driver[']s license, access to a personal vehicle for travel between unit locations and meeting minimum auto insurance requirements defined by the company" as among the "skill/experience requirements."  (Affidavit of Joseph A. Saccomano, Jr. ("Saccomano Aff.") Ex. H (Docket Entry #17).)  A bulletin entitled "Facilities Maintenance Expansion – 2006, QMT 1 Job Posting Process" provides that:

> A store Facility Maintenance Technician who does not post for a job, or a FMT who posts for a job but is not selected, will be offered a job within the store that matches his/her skills and abilities, as demonstrated in his/her previous job(s) at Sears. . . . If an associate declines the job offer, he/she will be removed from payroll as a voluntary resignation.

(Declaration of Locklsley O. Wade ("Wade Decl.") Ex. 2 (emphasis in original) (Docket Entry #17).[1])

On or around April 9, 2006, Plaintiff called the "88Sears employee helpline," a hotline Sears employees can call to obtain information about their employment.  (Def. 56.1 Statement ¶ 10.)  He spoke with Sears representative Michelle McMeins ("McMeins"), and told her that his FMT job "was being eliminated."  (Deposition of Paul White ("White Dep.") 84-85, Saccomano Aff. Ex. I.)  White testified that he told McMeins that he could not "take" or "accept" the QMT-1 position because he suffers from a seizure condition that prevents him from driving and performing the QMT-1 job; he also testified that he told her he did not formally apply, or "post"

---

[1] While this exhibit was not cited in Plaintiff's response to Defendant's 56.1 Statement, nor did Plaintiff include an additional statement of material facts as required by Local Rule 56.1(b), the court will consider the exhibit in the interest of thoroughness.

for the QMT-1 position because of his condition. (White Dep. 84-85, 87.) Plaintiff sent a letter to McMeins from his doctor stating that "he should refrain from driving any motor vehicle." (Def. 56.1 Statement ¶ 11.) Plaintiff spoke to McMeins again on or around April 12, 2006, and McMeins told Plaintiff that she was working on his case. (Id. ¶ 12.) The evidence cited by the parties does not indicate precisely when Plaintiff stopped working at Sears.

On April 24, 2006, Plaintiff accepted a job with his church, the Christian Heritage Church, as a maintenance manager. (Id. ¶ 13.) His starting salary at the church was $2,646.16 per month, whereas Plaintiff's pay at Sears as of April 2006 had been $2,014.13 per month, based on an hourly pay rate. (Id.)

According to Plaintiff, on April 24 or April 25, 2006, Icilda Solomon, the operations manager of the Sears store where he had been working, called him to inform him that Sears would allow him to take public transportation, instead of driving as the QMT-1 job required. (White Dep. 138-39; 163-64.) Plaintiff understood Ms. Solomon to have offered him the QMT-1 job. (Id. at 139; see also id. at 163 ("Q. And you were offered the QMT-1 position even though – they offered you the QMT-1 position even though they knew you had a seizure disorder, correct? A. Yes.").) Plaintiff told Ms. Solomon that he could not accept the job because of his seizure disorder. (Id. at 163.)

On April 26, 2006, McMeins contacted Plaintiff to offer him a position as a Receiver in the same Sears store where Plaintiff had been working as an FMT. (Def. 56.1 Statement ¶ 15.) The salary and benefits for the Receiver position were identical to those of the FMT position, and the job did not require driving. (Id.) Plaintiff testified that he did not accept that job because he had started the new job at Christian Heritage Church two days previously, and he did not want to quit the new job because it paid more money. (White Dep. 106-07.) Sears paid Plaintiff's

salary and benefits until April 26, 2006. (Id. at 179, 182.) Sears's certified personnel records indicate that Plaintiff was terminated on April 26, 2006.[2] (Saccomano Aff. Ex. A.)

### B. Plaintiff's Seizure Condition and Ability to Drive

Plaintiff was diagnosed with a seizure disorder in 1993. (Def. 56.1 Statement ¶ 18.) Plaintiff's seizure disorder is "well-controlled" by a medication called Dilantin. (Id. ¶ 20.) At the time of Plaintiff's deposition in April 2008, Plaintiff had not had a seizure in at least five years. (White Dep. 22.)

When asked at his deposition whether his seizures limit him in any way from performing his daily activities, Plaintiff answered "[n]ot at all," but when asked whether his seizure condition limits his driving, answered affirmatively. (Id. at 24-25.) He further testified that a neurologist told him to "stay away" from driving, so he drives "only locally." (Id. at 25.) Plaintiff has a valid New York State driver's license without driving restrictions and owns a car. (Def. 56.1 Statement ¶¶ 22-23.) Plaintiff drove to work at Sears every day, drives to his job at the Christian Heritage Church, and drives to church services every Sunday. (Id. ¶¶ 24-25.)

### C. Icilda Solomon's Statement

In opposition to Defendant's Motion, Plaintiff has submitted a notarized – but unsworn – statement from Ms. Solomon describing a conversation with White "on or about March 2006" and subsequent events.[3] (Wade Decl. Ex. 1.) According to Ms. Solomon's statement, during that conversation, Plaintiff asked whether, if he applied for the QMT-1 position, he could be assigned just to the stores in Brooklyn and whether he could travel to the stores by train. (Id.) Ms. Solomon told him "no" based on direction from her supervisors and did not offer him a

---

[2] Plaintiff disputes the date of his termination, citing to a statement of Ms. Solomon, discussed infra in Section I.C.

[3] While the statement contains a notary stamp, it has no jurat – "[t]he clause written at the foot of an affidavit, stating when, where, and before whom such affidavit was sworn," Black's Law Dictionary (8th ed. 2004) – or any "sworn to" language. Nor does the statement state that it was made under penalty of perjury as required for a declaration under 28 U.S.C. § 1746.

different position in the store in March 2006.  (Id.)  After she returned from vacation several weeks later, Ms. Solomon "found out" that Plaintiff had been terminated at the direction of general manager Nesley Salomon.  (Id.)  The statement also indicates that, following her return from vacation, Ms. Solomon was asked to call Plaintiff to offer him a Receiver position in the store.  (Id.)

Defendant asserts that Ms. Solomon's statement should not be considered because it is unsworn.  The law is clear that courts should disregard factual assertions in unsworn letters or statements submitted in response to a motion for summary judgment.  See Fed. R. Civ. P. 56(e) (stating that a response to a properly supported motion for summary judgment must be "by affidavits or as otherwise provided in this rule"); LeBoeuf, Lamb, Greene & MacRae, LLP v. Worsham, 185 F.3d 61, 65 (2d Cir. 1999) (noting that unsworn letters should be disregarded in evaluating a motion for summary judgment but that declarations pursuant to 28 U.S.C. § 1746 may properly be considered); cf. Capobianco v. City of New York, 422 F.3d 47, 55-56 (2d Cir. 2005) (holding that sua sponte exclusion of unsworn letters was an abuse of discretion where defendant had submitted them in support of its motion – thus waiving objections to their admissibility – and plaintiff relied on the letters in responding to the motion).[4]

The court agrees that unsworn documents should be disregarded in evaluating a motion for summary judgment, but out of an abundance of caution, the court has reviewed Ms. Solomon's statement and concludes that the facts presented therein – assuming that Plaintiff

_____

[4] In addition, courts have found that documents submitted to oppose summary judgment that had a notary stamp but lacked specific "sworn to" language were unsworn and thus should not be considered by the court.  In DeMars v. O'Flynn, 287 F. Supp. 2d 230 (W.D.N.Y. 2003), for example, the court disregarded letters in which the signatures were notarized, but the letters were not in affidavit form and none of the signatories "indicate that they are swearing to the statements under penalty of perjury."  Id. at 242-43 & n.8.  The court further noted that "[a] document's qualification as an affidavit is not determined by the presence or absence of 'the stamp or seal of a notary.'"  Id. at 243 (citation omitted); see also Persaud v. URS Midwest, Inc., No. 06-CV-3119 (JG), 2007 WL 4556908, at *6 (E.D.N.Y. Dec. 21, 2007) (noting that medical reports were "not presented in an admissible form" because "[t]here is no jurat, or 'sworn to me before' language, on the notary stamp affixed to the reports.").

could present them in an admissible form of a sworn statement or declaration from Ms. Solomon – do not affect the outcome of this decision.[5]

## II.    STANDARD

Summary judgment is appropriate where there is no genuine issue of material fact.  See Fed. R. Civ. P. 56(c).  The moving party has the burden to show the absence of a genuine factual dispute.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  A dispute regarding a material fact is genuine if the evidence is such that a reasonable finder of fact could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A material fact is one that "might affect the outcome of the suit under the governing law."  See McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (citation omitted).

In ruling on a motion for summary judgment, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments . . . ."  Weyant v. Okst, 101 F.3d 845, 854 (2d Cir. 1996) (citations omitted).  As such, the non-movant "will have [his or her] allegations taken as true, and will receive the benefit of the doubt when [his or her] assertions conflict with those of the movant." Samuels v. Mockry, 77 F.3d 34, 35 (2d Cir. 1996) (internal quotation marks and citations omitted).

Summary judgment is properly granted when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Abramson v. Pataki, 278 F.3d 93, 101

---

[5] While the statement does not indicate the date of Plaintiff's termination, it could conceivably give rise to an inference that Plaintiff was terminated prior to being offered another position at Sears.  In any event, as set forth below, this Memorandum & Order turns on whether Plaintiff has a disability within the meaning of the ADA; a factual dispute over the date of Plaintiff's termination does not affect that determination.

(2d Cir. 2002) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). While a non-moving party must do more than show "some metaphysical doubt as to the material facts," Matsushita Electric Industries v. Zenith Radio Corporation, 475 U.S. 574, 586 (1986), "all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial," McClellan v. Smith, 439 F.3d 137, 144 (2d Cir. 2006) (quoting First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968)).

## III.  DISCUSSION

### A.  The ADA

The ADA creates a private right of action for employment discrimination based on disability. 42 U.S.C. § 12112(a). Courts analyze such claims using the burden-shifting analysis established by the Supreme Court in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973). See Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006). Under that analysis, "[a] plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." Id.

To establish a prima facie claim of discrimination under the ADA, a plaintiff must show that: (1) his or her employer is subject to the ADA; (2) he or she is a person with a disability within the meaning of the ADA; (3) he or she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (4) he or she suffered an adverse employment action because of his or her disability. See id. at 169-70; accord Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 134 (2d Cir. 2008).

Discrimination under the ADA also includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." See 42 U.S.C. § 12112(b)(5)(A). To establish a prima facie reasonable-accommodation claim, a plaintiff must show that: (1) he or she is a person with a disability within the meaning of the ADA; (2) an employer covered by the statute had notice of plaintiff's disability; (3) with reasonable accommodations, plaintiff could perform the essential functions of the job at issue; and (4) the employer refused to make such accommodations. See Rodal v. Anesthesia Group, 369 F.3d 113, 118 (2d Cir. 2004).

### B. Plaintiff's Prima Facie Claim Under the ADA

Defendant contends that Plaintiff cannot establish a prima facie claim of disability discrimination under ADA because he cannot establish that he is a person with a disability within the meaning of the ADA. Defendant also argues that Plaintiff cannot establish that he was qualified to perform the essential functions of the position at issue or that he suffered an adverse employment action because of his alleged disability.[6] Defendant further contends that Plaintiff cannot establish a prima facie reasonable-accommodations claim. For the reasons below, the court concludes that Plaintiff has not presented evidence from which a finder of fact could conclude that he is a person with a disability within the meaning of the ADA, so he cannot establish a prima facie claim of discrimination.

---

[6] Defendant does not contest that it is an "employer" subject to the ADA. (Def. Mem. 5 (Docket Entry #17).)

### 1.    The 2008 Amendments to the ADA

In September 2008, Congress enacted the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 ("2008 Amendments"), which significantly expanded the scope of the ADA's definition of disability.  Congress included language in the "findings" and "purposes" sections of the 2008 Amendments that expressly rejects the limitations imposed by the Supreme Court's holdings in Sutton v. United Air Lines, 527 U.S. 471 (1999) and Toyota Motor Manufacturing, Kentucky Inc. v. Williams, 534 U.S. 184 (2002), which had "narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect" and caused "lower courts [to] incorrectly [find] in individual cases that people with a range of substantially limiting impairments are not people with disabilities."  See 2008 Amendments § 2.  Section 8 of the 2008 Amendments provides that "[t]his Act and the amendments made by this Act shall become effective on January 1, 2009." Id. § 8.  There is no language suggesting that the Act applies to conduct prior to the effective date of the 2008 Amendments.

The Supreme Court set forth a test for when a statute is to be applied retroactively in Landgraf v. USI Film Products, 511 U.S. 244 (1994).  Where, as here, a statute is not explicit as to whether it applies retroactively, the court must determine whether the new statute "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed."  Id. at 280.  If so, court must rely on the "traditional presumption" that the statute "does not govern absent clear congressional intent favoring such a result."  Id.  In Rivers v. Roadway Express, Inc., 511 U.S. 298 (1994), the Court further clarified that "[e]ven when Congress intends to supersede a rule of law embodied in one of our decisions with what it views as a better rule established in earlier decisions, its

intent to reach conduct preceding the 'corrective' amendment must clearly appear" before the statute can be retroactively applied. Id. at 313; see also Fernandez-Vargas v. Gonzales, 548 U.S. 30, 37 (2006) (noting that a statute is not given retroactive effect "unless such construction is required by explicit language or by necessary implication") (citation omitted).

Given the significant expansion in the 2008 Amendments of what constitutes a "disability," it is clear that the 2008 Amendments would "increase a party's liability for past conduct" if applied to this case. The court therefore applies the presumption against retroactivity in Landgraf and concludes that the 2008 Amendments should not apply to this case. This is consistent with the conclusions of other courts in this circuit that the 2008 Amendments do not apply to conduct prior to the effective date of the amended statute. See, e.g., Geoghan v. Long Island Rail Road, No. 06-CV-1435 (CLP), 2009 WL 982451, at *9 (E.D.N.Y. Apr. 9, 2009); Kravar v. Triangle Servs., No. 06-CV-7858, 2009 WL 805807, at *4 n.3 (S.D.N.Y. Mar. 27, 2009) ("[T]his Court joins other courts that have held that the Amendments Act's definition of "disability" does not apply to conduct that occurred before January 1, 2009."); Moran v. Premier Educ. Group, LP, --- F. Supp. 2d ---, No. 06-CV-1330 (DJS), 2009 WL 507505, at *7 (D. Conn. Feb. 13, 2009); Levy v. Hustedt Chevrolet, No. 05-CV-4832 (DRH) (MLO), 2008 WL 5273927, at *3 n.2 (E.D.N.Y. Dec. 17, 2008); Gibbon v. City of New York, No. 07-CV-6698 (NRB), 2008 WL 5068966, at *5 n.47 (S.D.N.Y. Nov. 25, 2008).[7]

## 2. Disability Under the ADA

The ADA defines a disability as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such

---

[7] Courts outside the Second Circuit have also concluded that the 2008 Amendments should not be applied retroactively. See, e.g., EEOC v. Agro Distrib., No. 07-60477, 2009 WL 95259, at *5 n.8 (5th Cir. Jan. 15, 2009); Kiesewetter v. Caterpillar, Inc., 295 Fed. App. 850, 851, 2008 WL 4523595 (7th Cir. Oct. 9, 2008); see also Supinski v. United Parcel Serv., Inc., No. 06-CV-0793, 2009 WL 113796, at *5 n.6 (M.D. Pa. Jan. 16, 2009) (collecting cases nationwide and noting that "every court that has addressed the issue has concluded that the 2008 Amendments cannot be applied retroactively to conduct that preceded [the] effective date").

impairment; or (C) being regarded as having such an impairment." 42 U.S.C.A. § 12102(1)

(West Supp. Dec. 2008).[8]  That the ADA defines disability "with respect to an individual,"

makes "clear that Congress intended the existence of a disability to be determined in such a case-

by-case manner."  Toyota, 534 U.S. at 198; see also Reeves v. Johnson Controls World Servs.

Inc., 140 F.3d 144, 151-52 (2d Cir. 1998) (noting that disability determinations are made on a

case-by-case basis).  While the Complaint appears to allege only that Plaintiff has an actual

impairment, Plaintiff asserts in his memorandum that he has a disability under all three

subsections.  (Pl. Opp. 3 (Docket Entry #17).)  The court addresses each claim in turn.

> a.  Whether Plaintiff Has a Physical or Mental Impairment That
> Substantially Limits a Major Life Activity

For Plaintiff to establish that he has a disability under the first subsection, he must

demonstrate that: (1) he has a mental or physical impairment; (2) the impairment limits one or

more major life activities; and (3) the limitation is substantial.  See Colwell v. Suffolk County

Police Dep't, 158 F.3d 635, 641 (2d Cir. 1998).  "[M]ajor life activities" are those "that are of

central importance to daily life."  Toyota, 534 U.S. at 197.  The Second Circuit has held that the

regulations of the Equal Employment Opportunity Commission ("EEOC") "are entitled to 'great

deference' in interpreting the ADA."  EEOC v. Staten Island Sav. Bank, 207 F.3d 144, 151 (2d

Cir. 2000) (citation omitted).  These regulations define "major life activities" to include

"functions such as caring for oneself, performing manual tasks, walking, seeing, hearing,

speaking, breathing, learning, and working."  29 C.F.R. § 1630(2)(i); see Capobianco, 422 F.3d

at 56.  While the EEOC's list of "major life activities" is "illustrative, not exhaustive," Bragdon

v. Abbott, 524 U.S. 624, 639 (1998), the court must consider "whether the impairment at issue

substantially limits the plaintiff's ability to perform one of the major life activities contemplated

_____

[8] This language is unchanged by the 2008 Amendments but was previously in Subsection 12102(2).

11

by the ADA, not whether the particular activity that is substantially limited is important to him," Reeves, 140 F.3d at 152 (citation omitted) (emphasis in the original).

The EEOC regulations define the term "substantially limits" as:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1).  Factors to consider in determining whether a major life activity is substantially limited include: the nature and severity of the impairment; its duration or expected duration; and the existence of any actual or expected permanent or long-term impact.  See id. § 1630.2(j)(2); Toyota, 534 U.S. at 196-98.  The court must also consider "the effect of measures that the individual employs to mitigate or correct the impairment."  Capobianco, 422 F.3d at 57; see Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 565 (1999); Sutton, 527 U.S. at 482.

The parties do not dispute that Plaintiff's seizure condition constitutes an impairment; rather, they dispute whether Plaintiff's impairment substantially limits a major life activity. Plaintiff's Complaint alleges that his seizure condition limits his ability to drive.  (Compl. ¶ 19.) Plaintiff does not dispute his deposition testimony, in which he conceded that he is "not all" limited in performing his daily activities but that his condition limits his driving:

> Q.    Do your seizures limit you in any way from performing your daily activities?
> A.    Not at all.
> Q.    Does your seizure disorder limit you from driving?
> A.    Yes.

(White Dep. 24-25.)  White testified that a neurologist told him to "stay away" from driving and submitted to McMeins a letter from his doctor stating that "he should refrain from driving any motor vehicle."  (White Dep. 25; Def. 56.1 Statement ¶ 11.)  It is undisputed, however, that

White has a valid, unrestricted New York State driver's license, owns a car, and drives to and from work and church.  (Id. ¶¶ 22-25.)

The Second Circuit has found that driving is not a "major life activity" as contemplated by the ADA.  Colwell, 158 F.3d at 643 ("[plaintiff] also identified a number of activities that cannot reasonably be deemed major life activities, such as driving . . . ."); accord Fleming v. Verizon N.Y., Inc., No. 03-CV-5639 (WHP), 2006 WL 2709766, at *16 (E.D.N.Y. Sept. 22, 2006); Sacay v. Research Found., 193 F. Supp. 2d 611, 627 (E.D.N.Y. 2002); Usala v. Consol. Edison Co., 141 F. Supp. 2d 373, 382 (S.D.N.Y. 2001).  While the determination of whether a person has a disability within the meaning of the ADA is made on a case-by-case basis, the Second Circuit has noted that "[g]enerally, it is only in connection with the determination of whether an impairment 'substantially limits' a particular plaintiff's exercise of a major life activity that an individualized inquiry is required."  Reeves, 140 F.3d at 152.  That is, the court must determine "whether the impairment at issue substantially limits the plaintiff's ability to perform one of the major life activities contemplated by the ADA . . . ."  Id. (citation omitted).  Because the Second Circuit has held that driving is not a major life activity, a condition that affects Plaintiff's ability to drive does not constitute a disability within the meaning of the ADA.

Even if driving were a major life activity contemplated by the ADA, the undisputed evidence demonstrates that Plaintiff is not "substantially limited" in his ability to drive.  As noted above, Plaintiff has a valid driver's license, owns a car, and drives to work and church.  Moreover, Plaintiff's seizure disorder is "well-controlled" by medication.  (Def. 56.1 Statement ¶ 20.)  Plaintiff testified at his deposition on April 3, 2008, that he had not had a seizure in at least five years, indicating that he had not had a seizure for approximately three years before the events giving rise to this lawsuit.  (White Dep. 22.)  "If an individual takes measures to correct or

ameliorate her impairment, 'the effects of those measures – both positive and negative – must be taken into account when judging whether that person is "substantially limited" in a major life activity.'"  Capobianco, 422 F.3d at 59 n.9 (quoting Sutton, 527 U.S. at 482); accord Murphy v. United Parcel Serv., Inc., 527 U.S. 516, 521 (1999).

In his memorandum of law, Plaintiff does not contend that the effect of his seizure condition on his ability to drive substantially limits a major life activity under the ADA, but argues that "without his medication, the plaintiff would be prevented from working, a major life activity . . . ." (Pl. Opp. 6) (emphasis added).  He notes that Congress's intent in passing the 2008 Amendments was to reject the reasoning in Sutton and other cases narrowly interpreting what constitutes a "disability" under the ADA.  (Id. at 4.)  The current ADA, as amended by the 2008 Amendments, provides in pertinent part that "the determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures," specifically listing "medication" as an example.  42 U.S.C.A. § 12102 (E)(i) (West Supp. Dec. 2008).

In light of the court's determination that the 2008 Amendments should not be applied retroactively to this case, however, the court is bound to follow the ADA as it existed prior to the 2008 Amendments.  Prior to the 2008 Amendments, the effects of mitigating measures "must be taken into account when judging whether that person is 'substantially limited' in a major life activity."  Capobianco, 422 F.3d at 59 n.9 (quoting Sutton, 527 U.S. at 482) (emphasis added). The court thus cannot consider whether and to what extent Plaintiff's seizure condition would limit him from working if he were not taking medication.

In any event, Plaintiff has not alleged in the Complaint or provided evidence in support of his assertion in his memorandum that "without his medication, the plaintiff would be prevented

from working." (Pl. Opp. 6.) For the specific major life activity of "working," the EEOC regulations define "substantially limited" as "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). In particular, "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." Id.; see also EEOC v. J.B. Hunt Transport, Inc., 321 F.3d 69, 72 (2d Cir. 2003) (noting that "[t]he Supreme Court has clearly stated that '[t]he inability to perform a single, particular job,' however, 'does not constitute a substantial limitation in the major life activity of working.'") (quoting Sutton, 527 U.S. at 493). In J.B. Hunt, for example, the Second Circuit considered the claims of applicants seeking positions as long-distance drivers of freight-carrying trucks and concluded that "[d]riving freight-carrying tractor-trailer trucks over long distances for extended periods of time is neither a 'class of jobs' nor a 'broad range of jobs,' . . . but rather a specific job with specific requirements." Id. at 75; see also Sutton, 527 U.S. at 493 (finding that the position of "global pilot" was a specific job rather than "major life activity"). Here, even if the court were to consider Plaintiff's condition without regard to the mitigating effect of medication, Plaintiff has provided no evidence that his seizure condition prevents him from working in a broad class of jobs.

In sum, Plaintiff has not provided evidence from which a fact finder could conclude that his seizure condition substantially limits a major life activity.

b.     Whether Plaintiff Has a Record of Having a Disability

Even if Plaintiff cannot show that his impairment substantially limits a major life activity, he may still have a disability within the meaning of the ADA if he can establish a "record of" a disability. 42 U.S.C.A. § 12102(1)(B). For Plaintiff to have "a record of" a disability under the

15

ADA, he must have a "history of, or ha[ve] been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k). In Colwell, the Second Circuit noted that this part of the definition "is satisfied if a record relied on by an employer indicates that the individual has or has had a substantially limiting impairment. . . . The impairment indicated in the record must be an impairment that would substantially limit one or more of the individual's major life activities." Colwell, 158 F.3d at 645 (citing 29 C.F.R. pt. 1630 App., § 1630.2(k)). The court noted that "[t]he record must be one that shows an impairment that satisfies the ADA; a record reflecting a plaintiff's classification as disabled for other purposes or under other standards is not enough." Id.

In his memorandum of law, Plaintiff relies on his deposition testimony that his supervisors at Sears knew about his condition:

> Q. How did they have actual notice of your condition?
> A. Seizures that I have had in the past. So my wife is the one or was the one that would call them and let them know that I cannot come to work because I'm in the hospital. I had another seizure.

(White Dep. 160.) This evidence demonstrates that Plaintiff's employers knew that Plaintiff had a seizure condition resulting in missed work and hospitalization for an unspecified duration and at some unspecified time in the past.[9] But this evidence does not indicate the existence of, let alone Defendant's reliance on, a "record" indicating an impairment that "that would substantially limit one or more of the individual's major life activities." See Colwell, 158 F.3d at 645. Even assuming that, at some point during his employment at Sears, Plaintiff's seizure condition was less well-controlled that it was in March and April of 2006, Plaintiff has not provided sufficient

---

[9] Plaintiff also cites Ms. Solomon's statement to support his assertion that "plaintiff's immediate supervisor and the store's general manager were well aware of plaintiff's impairment." (Pl. Mem. 7.) Even assuming that Plaintiff could submit the facts alleged in Ms. Solomon's unsworn statement in an admissible form, as discussed below, that Plaintiff's supervisors were aware of Plaintiff's impairment does not establish a record of disability as defined by the ADA.

evidence to demonstrate either that his impairment substantially limited a major life activity, or that Defendant misclassified him as having such an impairment. In Colwell, the Second Circuit rejected "record of" claims for plaintiffs whose personnel records indicating past impairments involved no greater degree of limitation of major life activities than the continuing impairments they showed, which did not rise to the level of substantially limiting a major life activity. 158 F.3d at 645-46. The court also rejected the remaining plaintiff's "record of" claim where the personnel record indicated a prior hospitalization of thirty days following a cerebral hemorrhage, because "the fact of [the plaintiff's] hospitalization does not establish a record of a substantially limiting impairment," given the temporary duration of the hospitalization. Id. (emphasis in original); see also Baerga v. Hosp. for Special Surgery, No. 97-CV-0230 (DAB), 2003 WL 22251294, at *7 (S.D.N.Y. Sept. 30, 2005) (noting that "a plaintiff's record of disability must still satisfy all three elements for proving actual disability in order to qualify him or her for ADA protection"). Here, Plaintiff has failed to raise sufficient evidence from which a finder of fact could conclude that he has a "record of" disability within the meaning of the ADA.

c.     Whether Plaintiff Was "Regarded As" Having a Disability

Plaintiff asserts that he was "regarded as" having a disability. (Pl. Mem. 6.) A "regarded as" claim under the ADA "turns on the employer's perception of the employee and is therefore a question of intent, not whether the employee has a disability." Colwell, 158 F.3d at 646 (citation omitted). "It is not enough that the employer perceive the employee as 'somehow disabled'; the employer must regard the employee as 'disabled within the meaning of the ADA,' i.e., having an impairment that substantially limits a major life activity." Capobianco, 422 F.3d, at 57 (citation omitted); see Sutton, 527 U.S. at 491. As noted above, Plaintiff has not explicitly alleged a "regarded as" claim in his Complaint, and does not name a specific major life activity

in his memorandum of law with respect to this claim. In any event, construing the facts in the light most favorable to Plaintiff, the facts suggest, at most, that Plaintiff was "regarded as" being limited in his driving, which is not a major life activity.

Even if Plaintiff claimed that he was "regarded as" being substantially limited in the major life activity of working, he would have to establish that his supervisors "perceived [him] to be incapable of working in a broad range of jobs suitable for persons of [his] age, experience, and training." Colwell, 158 F.3d at 647 (quoting Ryan v. Grae & Rybicki, 135 F.3d 867, 872 (2d Cir. 1998); see also Taylor v. Lenox Hill Hosp., No. 00-CV-3773 (GEL), 2003 WL 1787118, at *5 (S.D.N.Y. Apr. 3, 2003) (noting that "[s]ince employers are often aware of an employee's physical restrictions, plaintiff may not rest of conclusory allegations that the [defendant] considered him disabled or unqualified for the position at issue because of his limitation, but must present evidence that tends to show that defendant perceived him as substantially limited in a major life activity.")

Plaintiff has not provided sufficient evidence from which a finder of fact could conclude that his employers considered him substantially limited in working in a broad class of jobs. The Complaint alleges that Sears did not perceive Plaintiff's condition as a "problem." (Compl. ¶ 22.) Plaintiff testified that his supervisors offered him the QMT-1 position, even though they were aware of Plaintiff's seizure condition. (White Dep. 163.) In addition, Plaintiff testified that he told his supervisors and McMeins that he was unable to perform the driving required by the QMT-1 job and provided a note from his doctor stating that he should "refrain from driving." (White Dep. 163, 84-85, 87; Def. 56.1 Statement ¶ 11.) Even if Plaintiff's supervisors regarded him as unqualified for the QMT-1 position, Plaintiff has not provided evidence that he was regarded as unable to work in a "broad class of jobs"; it is undisputed that Plaintiff was offered a

job in the receiving department, which he declined because he had accepted another job that paid him more money.  (Def. 56.1 Statement ¶ 15; White Dep. 106-07.)  See, e.g., Roberts v. Health Ass'n, No. 07-3553-cv, 2009 WL 248069, at *3 (2d Cir. Feb. 3, 2009) (summary order) (noting that plaintiff failed to establish "that the employer believed that she suffered from a condition that prevented her from working in a broad class of jobs, not just the job that she previously had").

In sum, because Plaintiff has not provided sufficient evidence from which a finder of fact could conclude that he is a person with a disability under any of the three definitions of "disability" in the ADA, Plaintiff cannot establish a prima facie claim of intentional discrimination or a failure to make reasonable accommodations.  Accordingly, the court need not reach the remaining elements of a prima facie claim and grants summary judgment to Defendant on Plaintiff's ADA claims.

### C.  Plaintiff's Claims under New York State and Municipal Law

Plaintiff asserts similar disability discrimination claims under New York state and municipal law.  The definitions of "disability" in the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL") are broader than the definition of "disability" in the ADA.  See Giordano v. City of New York, 274 F.3d 740, 753 (2d Cir. 2001).  Therefore, the court's conclusion that Plaintiff's condition is not a disability under the ADA "does not foreclose the possibility of Plaintiff establishing that []he suffers from a disability" under the state or municipal law.  Witchard v. Montefiore Med. Ctr., No. 05-CV-5957 (JSR), 2009 WL 602884, at *22 (S.D.N.Y. Mar. 9, 2009).

The court takes no position on the merits of Plaintiff's claims under state and municipal law, however, because it declines to exercise supplemental jurisdiction over those claims.  While

the court could retain jurisdiction over those claims pursuant to 28 U.S.C. § 1367(c)(3), "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."  Carnegie Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1998); see also Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial the state claims should be dismissed as well.").  In Giordano, which concerned a plaintiff who did not have a disability within the meaning of the ADA, the Second Circuit explicitly noted that:

> [i]n the absence of any remaining federal claims, the appropriate analytic framework to be applied to discrimination claims based on a 'disability' as defined by the New York state and municipal law is a question best left to the courts of the State of New York . . . . Indeed, we conclude that the state-law claims should be dismissed so that the state courts can, if so called upon, decide for themselves whatever questions of state law this may present.

Giordano, 274 F.3d at 754; see also Gibbon v. City of New York, No. 07-CV-6698 (NRB), 2008 WL 5068966, at *6 (S.D.N.Y. Nov. 25, 2008) (declining to exercise supplemental jurisdiction over disability discrimination claims under the NYSHRL and NYCHRL because "plaintiff's ability to recover on those claims will turn, at least in substantial part, on state court interpretations of the statutes").  The court thus dismisses Plaintiff's pendent claims without prejudice to their renewal in state court.

## IV.    CONCLUSION

For the reasons above, Defendant's Motion for Summary Judgment is granted as to Plaintiff's ADA claims. The court declines to exercise supplemental jurisdiction over Plaintiff's remaining claims, which are dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3). Accordingly, the Clerk of the Court is directed to close this case.

SO ORDERED.

                                                       /s/ Nicholas G. Garaufis
Dated: Brooklyn, New York                     NICHOLAS G. GARAUFIS
       April 27, 2009                              United States District Judge